## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| DAVID ZWICK, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 14 C 5044 |
| | ) | District Judge Thomas M. Durkin |
| INTELIQUENT, INC., RICHARD MONTO, | ) | |
| and JOHN HARRINGTON, | ) | |
| Defendants. | ) | |

## PLAINTIFF DAVID ZWICK'S REPLY BRIEF
## IN FURTHER SUPPORT OF HIS MOTION TO COMPEL

**INTRODUCTION**

**I.     Inteliquent Has Not Met Its Burden of Establishing The Attorney-Client Privilege.**

**II.     DLA Has Not Met Its Burden of Establishing That The Requested Material Is Attorney Work Product.**

**III.     Inteliquent and DLA Have Not Established That Any Attorney-Client Privilege and Word Product Protection Was Not Waived.**

     A.     **Any conceivable attorney-client privilege was waived when DLA (at the Audit Committee's instruction) repeatedly shared the entire investigation with Deloitte.**

     **B.     Any conceivable attorney-client privilege was waived when DLA (at the Audit Committee's instruction) shared the entire investigation with Guests of the Audit Committee.**

     C.     **Any conceivable work-product protection was waived by Inteliquent's disclosures to the U.S. Department of Labor.**

**IV.     Zwick Has Demonstrated A "Substantial Need" For The Requested Materials.**

**V.     DLA Presents No Legitimate Basis To Bar Plaintiff From The Witness Of His Choice And Therefore The Court Should Compel Eric Roberts' Deposition.**

## INTRODUCTION

In June 2013, based on the flimsiest of accusations (Pl's Exh. 19), Inteliquent began an investigation into whether Inteliquent's CFO David Zwick had caused Inteliquent to take an improper impairment charge in Q4 2012; had engaged in improper financial forecasting; and had engaged in certain improper expense reimbursement requests. (The investigation also included whether CEO Ed Evans had engaged in certain improper expense reimbursement requests and had improperly hired someone personally close to him into the company). This was a witch-hunt pure and simple, as to both Mr. Zwick and Mr. Evans, and after Inteliquent engaged in a $2.4 million investigation, not a single accusation against Zwick or Evans related to the *purported* basis for the Investigation was sustained.

Inteliquent begins by arguing that Zwick's use of the phrase "investigation into Plaintiff Zwick," is an "inaccurate description" Inteliquent Opposition ("Int. Opp.") at 1, even though Inteliquent has previously conceded that Zwick was a target of the Investigation. Regardless what the Investigation is called, however, Inteliquent is correct that Zwick is seeking the entire file related to it (and not just those portions of it that Inteliquent and DLA want to turn over). Inteliquent and DLA provide no basis to prevent Zwick from this critically relevant discovery. Zwick's request includes: (1) all of DLA's interview notes from its Investigation in un-redacted form; (2) all written communications between DLA and Inteliquent about the Investigation; and (3) DLA's August 19 *written* Presentation to the Audit Committee and Guests. This motion also requests a Court Order for Inteliquent and DLA to answer deposition questions on those topics, as well as questions about DLA's August 19 *oral* Presentation to the Audit Committee and Guests (collectively, the "Requested Material").

For their part, Inteliquent and DLA refuse to produce the Requested Material with the exception of individual pages or portions of pages that they deem "relevant," arguing that:

(I)     all of the remaining documents and communications are protected by the attorney-client privilege;

(II)    all of the remaining documents and communications are protected by the work product doctrine;

(III)   DLA's repeated disclosures of the same information to Deloitte, the Audit Committee Guests, and the DOL have done nothing to waive either protection; and

(IV)    the work product exception set forth in Federal Rule of Civil Procedure 26(b)(3)(A)(ii) does not apply.

Each of these arguments should be rejected.

## I.     Inteliquent Has Not Met Its Burden of Establishing The Attorney-Client Privilege.

The party seeking to block discovery on the grounds of the attorney-client privilege carries the burden to establish each element of the privilege with respect to each document over which it is asserting the privilege. *U.S. v. White,* 950 F.2d 426, 430 (7th Cir.1991) (privilege must be established on document-by-document basis); *United States v. Lawless,* 709 F.2d 485, 487 (7th Cir.1983) (same); *Evans v. City of Chicago*, 231 F.R.D. 302, 312 (N.D. Ill. 2005) (same). Courts in this circuit have long held that because the privilege is in derogation of the search for truth it must be narrowly applied. *E.g.*, *Lawless*, 709 F.2d at 487 ("The scope of the privilege should be strictly confined within the narrowest possible limits"); *Matter of Walsh,* 623 F.2d 489, 493 (7th Cir.1980) (the "privilege is in derogation of the search for truth . . . and this circuit has repeatedly held that it must be strictly confined"); *Evans*, 231 F.R.D. at 312 ("the Seventh Circuit has directed that the scope of the privilege must be strictly confined within the narrowest possible limits"); *R.B.S. Citizens*, 291 F.R.D. at 216 (same).

Because the privilege withholds relevant information from the fact finder and is construed narrowly, it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege. *Fisher v. U.S.,* 425 U.S. 391, 403; *accord Lerman v. Turner*, No. 10 C 2169, 2011 WL 62124, at *3 (N.D. Ill. Jan. 6, 2011) (Brown, M.J.) *objections overruled,* No. 10 C 2169, 2011 WL 494623 (N.D. Ill. Feb. 4, 2011) (Lefkow, J).

The law is also clear that a party is not permitted to make a blanket claim of privilege, as Inteliquent has done here with respect to the Requested Material. *White,* 950 F.2d at 430 ("A blanket claim of privilege that does not specify what information is protected will not suffice"); *Lawless,* 709 F.2d at 487 ("a blanket claim of privilege is unacceptable"). Rather, Inteliquent must establish each element of the privilege on a document-by-document basis. *See R.B.S. Citizens*, 291 F.R.D. at 216 ("The party seeking to invoke the privilege must bear the burden of proving all of its essential elements . . . *as to each document*") (internal quotations omitted; emphasis added); *Central States, Se. & Sw. Areas Pension Fund v. Nat'l Lumber Co.*, No. 10 C 2881, 2012 WL 2863478, at *2 (N.D. Ill. July 11, 2012) (Lefkow, J.) (same); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 86 (N.D. Ill. 1992) (same). Indeed, for some documents, Inteliquent must make its showing on a statement-by-statement basis, because some pages of a document may be primarily filled with discoverable investigatory findings and contain only limited, if any, actual legal advice. *Lawless*, 709 F.2d at 487; *Central States*, 2012 WL 2863478, at *2. In such circumstances, the document must be produced, and only the protected communications redacted. *Id.*; *Matter of Walsh,* 623 F.2d at 493.

Under Inteliquent's burden, it must first establish that it sought "legal advice from a professional advisor in his or her capacity as such" and that the specific communication at issue related to the purpose of obtaining advice. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d

612, 618 (7th Cir. 2009). Inteliquent, however, has failed to establish that it sought the DLA investigators' *professional legal advice* in *their capacity as lawyers*, and not merely as investigators. As Inteliquent wrote clearly to the DOL, DLA was hired solely to investigate the Hotline Allegations and acted only in an investigatory capacity with respect to the documents that have been withheld. *See* Pl's Exh. 2 at 3 ("Inteliquent's board . . . determined that the Audit Committee should investigate the allegations, and it authorized the Audit Committee to hire independent outside professionals to assist in the investigation. Shortly thereafter, the Audit Committee engaged DLA Piper . . .").

As with any dispute between two parties, the best evidence of the reason or scope of a party's action are the documents that are prepared *contemporaneous with or near in time to the action at issue*. This important fact is especially significant here where – *before this discovery dispute ever arose* – Inteliquent repeatedly reduced to writing its purpose in hiring DLA and what it understood to be the scope of DLA's retention. Only *after this discovery dispute arose* did Inteliquent's stated reason for DLA's retention and the scope of DLA's engagement morph from what Inteliquent previously told the DOL under oath to what they now want this Court to believe. The Court should reject Inteliquent's recent shift of position and base its ruling on the position Inteliquent staked out clearly before the DOL.

First, Inteliquent repeatedly told the DOL that it hired DLA because of the Hotline Allegations and that the company authorized the Audit Committee "to hire independent, outside professionals to assist in the investigation" of the Hotline Allegations. (Pl's Exh. 2 at 3; Pl's Exh. 3 at ¶¶ 2-4, 29 (Defendant Monto declares under penalties of perjury that because of an "anonymous report via Inteliquent's internal ethics hotline, the Audit Committee retained outside professionals to "assist in the investigation"); Pl's Exh. 4 at ¶¶ 2-4, 12 (Audit Committee Chair

Ingeneri declares under penalties of perjury that because of an "anonymous complaint," the Audit Committee retained outside professionals to "help with the investigation").

Notwithstanding Ingeneri' s and Monto's own prior declarations stating simply and precisely that DLA was hired to assist with the Audit Committee's investigation of the Hotline Allegations, Inteliquent now mocks the suggestion that DLA was retained "merely to 'assist' as 'investigators,'" (*see* Int. Opp. at 5 (the internal quotation marks are Inteliquent's). Inteliquent tries to fix these admissions with a brand new Ingeneri affidavit (*id*.; Int. Opp. Exh. 1), in which he now repeats that his Committee retained DLA "to assist in the investigation," but for the first time adds a self-serving definition of the words "to assist in the investigation" to now mean "to conduct *and provide legal advice* in connection with the investigation rather than, for example, simply hiring an accounting firm to perform a forensic examination." (Int. Opp. Exh. 1, at ¶ 7.) Nowhere in the 20-page letter to the DOL (Pl's Exh. 2), the 29-paragraph Monto Declaration (Pl's Exh. 3), or Ingeneri's original declaration (Pl's Exh. 4) did Inteliquent ever once previously state anything whatsoever about hiring DLA to provide legal advice in connection with the investigation.

Indeed, to this day, Inteliquent never really identifies the legal advice it purportedly received from DLA. In other words, Inteliquent does not explain how DLA went beyond reporting what it learned in its investigation or the nature of the "advice" that was in fact provided. In 30 pages of briefs, Inteliquent and DLA never once say, "DLA specifically advised on the issue of X" or "DLA specifically advised on the issue of Y." Perhaps Inteliquent would prefer to rely on the Court to sift through hundreds of pages of withheld documents and figure out on its own where DLA gave advice and where it didn't, but:

(1) it is the Inteliquent and DLA's burden to establish all elements of their claim to discovery protection, and it should not fall upon the Court to develop that argument or ferret out the supporting evidence for them;

(2) Zwick submits that in any event, in reviewing the interview notes and the August 19 DLA Presentation, the Court will not find any "legal advice," and

(3) Even if the Court does find some document that arguably contains "legal advice" (and separately concludes that such legal advice was not subsequently waived by its disclosure to others), then the Court can order Inteliquent and/or DLA to redact only those portions of the notes and/or presentation and allow Zwick to access to the remainder.

Had Inteliquent and/or DLA engaged in a good faith attempt to identify what was in fact protected by the attorney-client privilege, instead of a document dump on the Court and invocation of a blanket privilege, which the cases clearly prohibit, then this could conceivably be a closer case, but Inteliquent chose to assert a blanket privilege where clearly none attached, and that blanket privilege should summarily be denied.

Inteliquent attempts the same basic approach of now trying to change the intention of the DLA Engagement Letter at the time it was entered. (Pl's Exh. 5). That letter, which Ingineri reviewed and signed on June 10, 2013, specifically contains an express "Limitation on the Scope of Engagement," stating "our representation of the Audit Committee does not include representation of any of its affiliates . . . [and] the Firm owes no attorney-client duties to . . . affiliates other than the Audit Committee, even if the Audit Committee might owe them fiduciary or other duties." (*Id.* at 1.) Similarly, the Engagement Letter specifically identifies the scope of the engagement as:

(1) conduct a preliminary review of [the complaints against senior management received through Inteliquent's internal anonymous complaint system];

(2) make recommendations "with regard to appropriate follow-up"; and

(3) conduct "any internal investigation" that may be necessary.

6

*Id.* at ¶ 1.  Nowhere in the letter's actual "scope language" does it state that DLA was to provide legal advice.  Interestingly, Inteliquent argues (without citation to authority) that DLA's "very typical engagement letter" and its "standard provisions regarding progress and reporting of advice" establish that DLA's investigative work was for the purpose of offering legal advice, but this argument is a nonstarter.  Indeed, judges in this circuit have rejected this very argument. *See, e.g., Domanus v. Lewicki*, No. 08 C 4922, 2012 WL 6568227 at *5 (N.D. Ill. Dec. 14, 2012). In *Domanus*, Magistrate Judge Rowland specifically held that the boilerplate language in attorney correspondence "cannot confer privilege".  In this case, the Inteliquent/DLA Engagement Letter uses the word "advise" only once and "advice" only once.  First, it uses a "standard provision" opening sentence (Inteliquent's own words) that it has been hired to "advise," but later where the scope of the engagement is spelled out in detail, there is no mention whatsoever of the word "advise."  Similarly, Inteliquent relies on the word "advice" on the second page of the Engagement Letter, but the "advice" referred to there is nothing more than providing "advice on the progress of the investigation," not legal advice on legal issues.  Indeed, Inteliquent attempts to twist the sentence into pretzel knots by referring to it as a "standard provision . . . regarding progress and reporting of advice."  Int. Opp. at 3.  Even putting aside that Inteliquent's twist on this sentence makes no sense, more importantly it does not accurately portray this key sentence.  In actuality, the cited sentence says nothing more than that DLA will *advise* the Audit Committee on the progress of its investigation, not provide legal "advice."

In sum, *the tailored language* of DLA's Engagement Letter and the actual work that DLA performed establish clearly that no attorney-client privilege for this investigation attached in the first instance.  Just as in *Wartell v. Purdue Univ.y*, Case No.13 CV-99, 2014 WL 4261205 (N.D. Ind. Aug. 28, 2014) (Miller, J.), the DLA investigators performed tasks such as

interviewing, inspecting, and engaging in conversations "that generally remove the attorneys' activities form the purview of the attorney-client privilege." *Id*. at *5. Hiring an attorney to conduct an investigation that the Audit Committee itself could have conducted does not cloak the investigation in privilege. *Id.*; *Cf. also Sandra T.E.,* 600 F.3d at 618-19 (finding privilege specifically because attorneys were hired *as attorneys*, and conducted themselves as such, and not just as investigators, with regard to specific articulated claim).

In sum, it is Inteliquent's burden to establish that its engagement of DLA was far broader than what it states in the Engagement Letter and far broader than what Inteliquent repeatedly (and under oath) told the DOL. It has not and cannot do so, and it cannot meet its burden to establish that Zwick's access to the communications is barred by the attorney-client privilege.

## II. DLA Has Not Met Its Burden of Establishing That The Requested Material Is Attorney Work Product.

The work product doctrine provides that a lawyers' mental impressions, conclusions, opinions, or legal theories during (or in anticipation of) litigation are immune from discovery, but that factual information that an attorney collects during litigation (or in anticipation of litigation) is generally not protected. *R.B.S. Citizens, N.A. v. Husain*, 291 F.R.D. 209, 216 (2013). The doctrine also provides that where the discovering party has a substantial need for the discovery, that need may trump the concerns expressed by the work product doctrine, and work product privilege may be overborne. Fed.R.Civ.P. 26(b)(3).

It is well settled that the threshold determination in a case involving a claim of work product privilege is whether the material sought to be protected from discovery was prepared during litigation or in anticipation of litigation. *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2009); *Logan v. Comm. Union Ins. Co*., 96 F. 3d 971 (7th Cir. 1996); *Binks Mfg. Co. v. Natl. Presto Indus., Inc.*, 709 F.2d 1089, 1118 (7th Cir. 1983). The courts have

repeatedly expressed concern that if the work product doctrine is applied in an overbroad manner it "becomes an all-encompassing shroud of secrecy that is at once at odds with the federal rules' liberal discovery policy and the protection of attorney's thought processes and strategies the doctrine was designed to be." *E.g., Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 145 F.R.D. 84, 86-87 (N.D. Ill. 1992). As Magistrate Judge Bobrick pointed out in *Allendale*,

> Rather than using the doctrine to immunize these [litigation] strategies and opinions from discovery, some discovery opponents seem to use the doctrine to relieve themselves of the burden of producing factual information accumulated in what appears to be routine investigations. Accordingly, we have found it helpful to express the elements of the work product doctrine into the concepts of "causation" and "reasonable anticipation" of litigation.

*Id*. at 87. Therefore, a court must look to whether in light of the factual context "the document can fairly be said to have been prepared or obtained *because* of the prospect of litigation." *Logan,* 96 F.3d at 977 (quoting *Binks*) (emphasis in original); *see also* Fed.R.Civ.P. 26(b)(3).

Both Inteliquent and DLA refer to a subsequently filed (and shortly thereafter dismissed) securities action as if that somehow retroactively changes the nature of DLA's investigation. The Seventh Circuit rejected this argument years ago in the seminal *Binks* decision: "The mere fact that litigation does eventually ensue does not, by itself, cloak materials prepared by an attorney with the protection of the work product privilege; the privilege is not that broad." *Binks*, 709 F.2d at 1118. Indeed, even one of DLA's own cited cases, *U.S. v. S. Chicago Bank*, No. 97 CR 849, 1998 WL 774001 (N.D. Ill.) (Zagel, J.), likewise rejected such a claim: "Documents prepared in the ordinary course of business or based upon a mere contingency of litigation are not work product, and neither are documents that would have been created in essentially the same form, irrespective of litigation." *Id*. at *7, *citing Binks Mfg.,* 709 F. 2d at 1119.

DLA, however, makes the additional unique argument that work-product protection should be found here "given the nature of plaintiff, class-action securities firms, [which] all but

guaranteed the Company would find itself in litigation." DLA Opp. at 10. In other words, DLA wants this Court to adopt a rule that any time a company announces an investigation into the company's earnings reports or its financial forecasting, then any internal investigation is protected work product because it is inevitable that one of those big bad plaintiff class action securities firms will eventually sue the company. If the Court were to take this argument seriously, it would in fact suggest quite the opposite of *Binks*: that the work-product protection applies to *every* attorney-conducted investigation involving this subject matter given the all-but-"guarantee" that these class action firms present. This unsupported "guarantee" argument was discredited by *Binks* and should be outright rejected here.

The bottom line is there was no litigation at the time that DLA was hired; there was no anticipation of litigation that was ever discussed between DLA and Inteliquent (or certainly not that DLA or Inteliquent have brought forward); there is no mention of anticipated litigation in the DLA Engagement Letter (indeed, any such mention is specifically absent from the "scope of the engagement"); there was no mention of anticipated litigation when Inteliquent repeatedly described DLA's retention to the DOL; and there was no mention of anticipated litigation when several Inteliquent Officers swore under penalties of perjury that the reason DLA was hired was to assist in an internal investigation of the Hotline Allegations. There is no work product protection over the withheld DLA materials, and Mr. Zwick respectfully requests this Court to order their immediate production.[1]

---

[1]     DLA argues that it has already met all of its obligations to produce documents in response to Zwick's subpoena, asserting on pages 5-6 that during a December 11, 2014 meet and confer Zwick agreed to modify his subpoena from all Investigation documents in DLA's possession to just a few documents that were identified during that call. DLA Opp. at 5-6. DLA's argument should be summarily rejected because no such subpoena modification ever occurred and no such agreement was ever reached.                                              *footnote cont.,*

III.    **Inteliquent and DLA Have Not Established That Any Attorney-Client Privilege and Word Product Protection Was Not Waived.**

As noted above, it is Inteliquent's and DLA's burden to establish all of the elements of the attorney-client privilege and work protect protection. One of those elements is "except the protection be waived." *White,* 950 F.2d at 430. In crafting an eight-part test for the attorney-client privilege, courts have long held (indeed, going all the way back to Wigmore) that it is not just the withholding party's burden to prove the privilege, it is also the withholding party's burden to prove that waiver has not occurred. *Id.* ("The burden falls on the party seeking to invoke the privilege to establish all the essential elements"). For the reasons stated immediately below, neither Inteliquent nor DLA have met their burden related to waiver.

A.    **Any conceivable attorney-client privilege was waived when DLA (at the Audit Committee's instruction) shared the investigation with Deloitte.**

On page 9 of its Opposition, Inteliquent concedes, as it must, that sharing factual information from the DLA Investigation with its outside auditors Deloitte waived the attorney

---

During the December 11 call, it became immediately clear that Mr. Collins, DLA's new representative, was not familiar with any of the central issues being discussed. Both Zwick's and Inteliquent's counsel explained to DLA's counsel that DLA and Inteliquent had already waived any claim of attorney work product or attorney work product that might apply to the "Zwick-Burgener Conversation." In addition, Collins agreed on the call to try to answer some of Zwick's basic inquiries, such as whether Smith, King, or Roberts took any notes taken during the August 19 DLA Presentation, whether DLA had entered into any supplemental engagement letter with Inteliquent, and whether there were emails between DLA and Inteliquent that led up to or immediately followed the August 19 DLA Presentation. At no time during that meet and confer was there any discussion, agreement, or even suggestion by Zwick or DLA that the production of such items was in lieu of or in satisfaction of the broader request set forth in Zwick's subpoena. Indeed, it was not until almost *six weeks later*, that Collins raised for the first time the notion that documents discussed during the meet and confer would satisfy the subpoena, stating, "[w]e proceeded under the good faith presumption that those 4 categories would satisfy the subpoena."

Now, in response to the motion to compel, Mr. Collins' "presumption," first mentioned on January 19, has morphed into Zwick's December 11 "agreement," an agreement on which Zwick's counsel has now "reneged." DLA Opp. at 6. DLA's assertion of a reneged agreement is wholly concocted; there is no one shred of evidence to support it; and this Court should summarily reject it.

client privilege with respect to any such shared information.  Int. Opp. at 9.  Here, there is massive evidence that DLA shared factual information from its investigation with Deloitte.

First, Defendants Inteliquent and Monto have repeatedly stated that they authorized DLA to share the materials from the investigation with Deloitte.  Pl's Exh. 2 at 6-7 (the Inteliquent Audit Committee authorized DLA to provided Deloitte with updates of its Investigation); Pl's Exh. 3 at ¶ 7 ("authorized DLA Piper to provide Deloitte with period updates regarding its work"); *Id.* at ¶ 8 (DLA provided Deloitte an update on August 14).

Second, on August 2, 2013, Deloitte's Brad Garret told Zwick that DLA Piper was giving Deloitte "daily updates" about the Investigation.  Exh. 18.

Third, between the time that DLA made its August 19 Presentation and the time Inteliquent terminated Zwick, DLA arranged to give Deloitte a final briefing about the Investigation that it had just completed.   From a lengthy e-mail chain on the subject, it appears that DLA gave Deloitte that additional briefing on August 20, 2013.  Pl's Exh. 20.

Fourth, during that same email exchange to set up the final briefing, DLA's Jon King admitted that Deloitte was in possession of all the emails that DLA had used during its Investigation.  August 19, 2013 King to Monto Email, Exhibit 20, at 1 ("Deloitte is more well-versed in the facts, having seen all of the emails . . . ").

Inteliquent concedes that these communications waive the attorney-client privilege, but, along with DLA, assert that such communications do not waive the work-product doctrine because Deloitte was not Inteliquent's adversary at the time and therefore did not increase the likelihood that the DLA's protected work product (if any), would be disclosed to adverse parties. The two big problems with this argument are: (1) it assumes the work-product doctrine applies in the first instance, when in fact for all the reasons stated above, it does not; and (2) it does not

accommodate for the fact that Inteliquent also substantially used facts from DLA's underlying "financial issues" investigation in an attempt to persuade the DOL that it had not retaliated against Zwick. The disclosures to the DOL waived any work-product protection that conceivably may apply to the Requested Materials, and that waiver is set forth in Section III.C. below.

> **B.    Any conceivable attorney-client privilege was waived when DLA (at the Audit Committee's instruction) shared the entire investigation with Guests of the Audit Committee.**

As noted in Zwick's Motion [Dkt. 31, at 2] and also above in Section I, the Inteliquent Audit Committee and DLA entered into an Engagement Letter that specifically cabined the relationship between them.   DLA made it a special condition of the engagement that it represented only the Audit Committee and none of its affiliates.   (The reason DLA may have demanded this provision was so that if a separate client later wanted to sue Inteliquent, this engagement for the Audit Committee would not have stopped DLA from doing so.)   But the "reason" for the limitation is really beside the point.   The fact is that the two parties agreed to the limitation, including the sentence stating,

> [DLA's] representation of the Audit Committee does not include representation of any of its affiliates .  .  . [and] the Firm owes no attorney-client duties to .  .  . affiliates other than the Audit Committee, even if the Audit Committee might owe them fiduciary or other duties.

*Id*. at 1.  When the Audit Committee invited three non-Audit Committee Board Members to the August 19 DLA Presentation, the Committee waived any privilege it had with respect to that Presentation.  Inteliquent argues that this cannot be so because any legal advice that DLA gave to the Audit Committee would eventually need to be shared with the full Board.  Int. Opp. at 10-11. But Inteliquent and the firm it retained, DLA, cannot have it both ways.  They cannot expressly agree to limit the representation to the Audit Committee, and then when that provision becomes inconvenient, allow Inteliquent to behave as if that provision does not exist.  Once DLA insisted

on this provision and once Inteliquent acquiesced in it, one of two things was inevitable: (1) either the Audit Committee – and only the Audit Committee – had to report its recommendation to the full Board without disclosing DLA's purported "legal advice" (of which we believe there was none), or (2) the Audit Committee would have to waive the privilege with respect to any portion of DLA's purported legal advice that it chose to share with the full Board.[2]

Inteliquent and DLA put themselves in the position of limiting what could be shared with the full Board without waiving the privilege, and now they behave as if Zwick is to blame for suggesting that the "well-established" law on this issue is inapplicable. (*See* Int. Opp. at 10, citing *Lawrence E. Jaffee Pension Plan v. Household Intl., Inc*., 244 F.R.D. 412, 427 (N.D. Ill. 2006), and an additional out-of-circuit case). But the cases on which Inteliquent relies involved the Audit Committee *and its affiliates* retaining a law firm for legal advice, not a case such as this where the Audit Committee *with an express exclusion of affiliates* retained a law firm to assist in an internal investigation. It is for this reason that the isolated quote that Inteliquent provides from *Jaffee* is inapplicable.

In sum, when the Audit Committee invited outside guests to the DLA presentation, any attorney-client privilege that may have attached to the DLA Presentation was then waived.

---

[2] It is not at all unusual for a public company's Audit Committee to retain its own counsel that is independent of both the Company's inside lawyers and also independent of the Company's outside counsel, but when it does so, it is more than a legal fiction. Most companies – at least most careful companies – meticulously maintain the privilege between the Audit Committee and its outside lawyers. This is why when one of Zwick's counsel recently interviewed for retention by an audit committee, the Company's General Counsel made the introduction to the Audit Committee members and then immediately left the room, fully understanding that the Company's General Counsel represents the Company, not the Audit Committee, and that his presence in the room would destroy any privilege that existed. In this case, the fact that the Audit Committee so blithely invited both the Company's General Counsel and three non-Audit Committee Board Members to DLA's presentation actually supports Zwick's argument that neither Inteliquent nor its Audit Committee ever considered the DLA Presentation to be protected by the attorney-client privilege in the first instance.

### C. Any conceivable work-product protection was waived by Inteliquent's disclosures to the U.S. DOL.

As DLA concedes, this Court must consider Federal Rule of Evidence 502(a) in assessing whether DLA's purported work protect protection was waived. Rule 502(a) provides that a lawyer waives a claim of "work product" when he or she makes an [1] intentional disclosure of some of the material; [2] the disclosed and undisclosed material concern the same subject matter, and [3] fairness requires considering the material together. Subject matter waiver applies therefore where "fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." Fed. R. Evid. 502 adv. comm. nn. (2007). Properly applied, Rule 502(a) mandates that when Inteliquent and DLA made selective disclosures to the DOL from DLA's claimed work-product-protected materials and did so at a time when the DOL was investigating Inteliquent's actions towards Zwick, DLA and Inteliquent fully waived any work-product protection that ever could have attached to DLA's materials.

DLA correctly observes that subject matter waiver under Fed. R. Evid. 502(a) is limited to situations where the privilege holder seeks to use the disclosed material for its advantage while denying the adversary access to additional materials that could provide an important context to the disclosed material. DLA Opp. at 13. As the Seventh Circuit has made clear, the Rule 502(a) determination of whether the undisclosed material ought to be considered with the disclosed material requires a case-specific analysis of the subject matter and the adversaries. *See Appleton Papers, Inc. v. EPA*, 702 F.3d 1018, 1026 (7th Cir. 2012). Yet DLA fails to acknowledge the simple application of the rule to the facts here, and instead relies on a misrepresentation of Mr. Zwick's position. In this case, when Inteliquent and its counsel were before the DOL, they relied on detailed and specific disclosures of the investigation in order to

15

further their accusations against Mr. Zwick, and the arguments and specific disclosures they made before the DOL mirror those being made against Mr. Zwick in this action. And, even though Inteliquent and DLA continue to assert the false dichotomy between the "Financial" portion of the investigation and the "Zwick-Burgener Conversation" portion of the investigation, the fact is that Inteliquent repeatedly attempted to justify its investigation of Mr. Zwick to the DOL by emphasizing the financial issues that were the original, underlying, purported basis for the investigation. *See* Pl's Exh. 2 at 3-4 and 6-8.

This is precisely the type of situation in which courts in this Circuit have ordered production under Rule 502(a). *See, e.g., In re Aftermarket Filters Antitrust Litig.*, No. 08 C 4883, 2010 WL 4622527, at *6 (N.D. Ill. Nov. 4, 2010) (Brown, M.J.) (finding it unfair to allow plaintiffs to selectively produce to defendants one document regarding a disputed subject matter while withholding an additional document regarding the same subject); *Trustees of the Elec. Workers Local No. 26 Pen. Trust Fund v. Trust Fund Advisors, Inc.,* 266 F.R.D. 1, 11 (D.D.C. 2010). Any purported work product protection that DLA asserts was therefore waived when Inteliquent obtained some of DLA's purportedly protected documents and used them during the DOL investigation to defend its retaliatory termination of Zwick.

In addition, there are at least three reasons that this Court should reject DLA's assertion Zwick's 502(a) argument is merely speculative. First, because a party asserting waiver under Rule 502(a) never has access to the materials being withheld, every party in this situation could assert that a 502(a) argument is merely speculative. ("You have no idea whether the disclosed and undisclosed documents are sufficiently connected because you have never seen the undisclosed documents."). This is not a valid basis to deny a Rule 502(a) assertion out of hand.

Second, the entire rationale behind Rule 502(a) is that fairness compels discovery of the *full context* of the self-serving disclosures from the DLA Investigation on which Inteliquent relied before the DOL, and not simply those portions of DLA documents that Inteliquent chose to use against Mr. Zwick. (*See* Zwick's Mem. at 12-13.)

Third, Mr. Zwick's substantive argument as to pretext is based on substantial evidence already developed. It is based on the incredibly weak nature of the allegations against Zwick and Evans in the first instance. *See* Exhibit 19. It is also based on the fact that the CFO who immediately preceded Mr. Zwick repeatedly missed their earnings estimates and he was never investigated, and the CFO who followed Mr. Zwick at Inteliquent repeatedly missed his earnings estimates and he was never investigated. Why is that? It is also based on the fact that Inteliquent tried to hire Mr. Burgener back into Inteliquent less than seven months after terminating him for behavior that Inteliquent has referred to as "misconduct" and "critical misdeeds." *Compare* Pl's Exh. 10 (emails re: re-hiring Mr. Burgener) *with* Pl's Exh. 2, at 1-2, 8-9 (Zwick and Burgener terminated for obstructing the investigation and lying to the DLA investigators, variously described as their "misconduct," "critical misdeeds," and "management integrity concerns"). If that is not compelling evidence of pretext (hiring someone back who just engaged in lying during and obstructing an investigation), then whatever could be?

## IV.    Zwick Has Demonstrated A "Substantial Need" for the Requested Materials.

Federal Rule of Civil Procedure 26(b)(3)(A)(ii) provides that even if documents are protected under the work-product doctrine, they may still be discovered if they are otherwise discoverable under Rule 26(a)(1) and the party seeking the documents has "substantial need for the materials to prepare its case, and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(b)(3)(A)(ii).

Here, Mr. Zwick has demonstrated a substantial need for the materials being withheld and there is no other way to obtain the materials other than through DLA. DLA's sole argument is that Zwick's assertion of substantial need depends "entirely on the speculation that something within DLA's work-product will support his theory." DLA Opp.at 13-14. But, as noted with respect to Rule 502(a), couldn't this be said of every party who has ever asserted substantial need for documents being withheld on work product grounds?

But there is a more fundamental reason: Rule 26(b)(3)(A)(ii) does not talk about the whether the documents for which the discovering party has substantial need will ultimately be powerful enough to prove that party's case; it doesn't say that a party is only entitled to invoke Rule 26(b)(3)(A)(ii) if the Court is 100% convinced that once turned over, the material will win the case for the requesting party. Therefore, DLA's reliance on the *Logan* case is easily distinguishable on the simple ground that unlike the allegations in *Logan*, Zwick's allegation of pretext is neither "mere," "naked," nor "a fishing expedition." Here, Mr. Zwick has already presented substantial evidence to support his claim of pretext. *See supra* at 17.

Finally, we are pleased that DLA has turned over some of the documents at issue to the Court for *in camera* review. We would certainly have requested it if DLA had not volunteered it. Indeed, we are willing to go a step further. If the Court, after reviewing the documents has any additional questions about the relationship between the documents over which DLA has already waived work product and the documents over which they have continued to assert work product (and now submitted to the Court), we would be happy to answer and indeed, bring Mr. Zwick in to answer, any of the Court's questions in support of our claim for substantial need under Rule 26(b)(3)(A)(ii).

**V.     DLA Presents No Legitimate Basis To Bar Plaintiff From The Witness Of His Choice And Therefore The Court Should Compel Eric Roberts' Deposition.**

For all the reasons already stated above in Sections I-IV, DLA's August 19 written Presentation to the Audit Committee and its Guests is fully discoverable, both the written and oral portions.  That presentation and the one that followed to the full Board clearly led to Mr. Zwick's termination, and neither Inteliquent as a party nor DLA as a subpoenaed party have met their respective burdens of establishing that the information may be withheld.

Respectfully, in addition to ordering production of DLA's written Presentation, the Court should also compel the deposition of Eric Roberts, one of the DLA attorneys who was present for the August 19 oral Presentation and for whom DLA seeks this Court's "protection."  As an initial matter, it is very odd that DLA now refuses to produce Mr. Roberts, given that DLA's General Counsel Charlie Deem had previously written:

> With Thanksgiving next week, it doesn't look like we will be able to pull together Eric Roberts for Monday, [Nov. 24].  Let me get some alternative dates and propose those.

> Patrick Smith is based out of our New York office.  I want to confirm that any deposition of Mr. Smith will take place in New York.  I will check on possible dates for Messrs. Jon King and Patrick Smith, as well.

The deposition was later scheduled for December, but then postponed once again until January 14, 2015, but despite DLA's express agreement to produce Mr. Roberts for deposition on January 14, 2015, as well as confirmation of that deposition, DLA unilaterally cancelled the deposition on January 13 and made clear it would not produce Mr. Roberts without a Court Order (or at least Court resolution of the privilege and work product issues).

DLA asserts four reasons why this Court should quash Roberts's subpoenaed deposition. First, it asserts that Mr. Roberts' deposition would be unreasonably cumulative and duplicative on the issue of DLA's August 19 oral Presentation.  (DLA's Opp. at 4, citing Fed. R .Civ. P. 26.)

DLA makes this argument notwithstanding that not a single DLA deposition has yet been taken in the case. What DLA is really arguing is not that the deposition would be "cumulative" or "duplicative" of depositions that have already occurred, but rather that DLA wants Zwick to depose *the attorneys that DLA wants Zwick to depose* about this issue and not the attorneys that Zwick wants to depose on this issue. This is not a basis to quash the subpoena.

Nor will the August 19 oral Presentation actually receive duplicative treatment later if and when DLA attorneys King and Smith are deposed. We have repeatedly told DLA that *we would not ask three different DLA attorneys about DLA's August 19 oral presentation*, *see e.g.,* Exhibit 15, but DLA does not want to take yes for an answer and it continues to argue that "there is no justification for deposing three DLA attorneys about the same exact presentation." (DLA's Opp. at 5.) DLA concedes in its brief that "two depositions should clearly suffice" on this issue," *Id*., ***and we agree***. But DLA must not be allowed to dictate who Mr. Zwick gets to question about the conference call that led to Mr. Zwick's termination. And contrary to DLA's argument, Rule 26 does not require that Zwick to depose the lawyer who was the "most involved" or that is "most senior" or that DLA "most wants to put up." DLA has not provided any case law that supports that notion, and indeed, there is none.

DLA's second argument is that during the meet and confer process, Zwick's counsel refused to answer Mr. Collins' repeated demands for the questions that Zwick's counsel intended to ask Roberts, DLA Opp. at 4, and that by refusing to do so, Zwick made a "tacit admission that Roberts' deposition is entirely unnecessary." *Id.* at 5. Zwick has made no such admission, tacit or otherwise. Zwick's counsel is not obliged to headline their deposition plan for Inteliquent and DLA. It is was more than enough that Zwick informed DLA in good faith that the focus with Roberts would be the August 19 oral Presentation in which he participated and that Zwick's

counsel wanted to depose Roberts first on this issue. We did not believe then and still do not believe now that Zwick is required to justify to DLA the reasons for preferring one over another or that we are required to inform DLA of the questions that we were going to put to Mr. Roberts.

DLA's third argument appears to be that as a "second year associate" (he is now a fourth year associate), Mr. Roberts needs this Court's special protection from having to give his deposition, and that the Court should instead force Zwick to depose the two Co-Chairs of DLA's White Collar Investigations Department on this issue. We have more confidence in Mr. Roberts' ability to handle the deposition than does DLA. Mr. Roberts is a 2008 graduate of Duke University and a 2011 graduate of the Duke Law School. According to a May 2011 Duke Law newsletter, Mr. Roberts was one of the honorees at his law school graduation ceremony, based on his school work in Environmental Law. In 2013, at the same time he was working on this case, it appears Mr. Roberts was the principal draftsman on a brief in the Illinois Supreme Court. Third-party lay witnesses – even those without law degrees – have their third-party depositions taken every day. Mr. Roberts is more than capable of sitting for his.

Nor does DLA's fourth argument – that King and Smith (and not Roberts) actually *made* the August 19 oral Presentation – alter the result. Usually it is the person *listening* – and not the person *talking* – who has a clearer picture of what was actually said; that is especially true in this instance where one would anticipate that a second-year associate added to the conference call *would be taking notes of the call*. (Why else is DLA charging for his time on the call if he has no role?) DLA and Inteliquent both insist, however, that there are no notes of the conference call. Does that mean that no notes were ever taken or that notes were in fact taken and then subsequently destroyed? Among other things, Mr. Roberts' deposition will get to the bottom of DLA's odd response regarding the complete absence of notes.

In sum, there is no necessary or logical basis to bar Mr. Roberts' deposition, and Mr. Zwick respectfully requests this Court to grant his motion to compel Roberts' deposition.

## CONCLUSION

For all these reasons, Mr. Zwick requests this Court to grant his motion to compel in its entirety and order as follows:

1. The attorney-client privilege does not attach to the DLA Investigation.

2. The work product doctrine does not attach to the DLA Investigation.

3. Even if either of these two protections existed in this instance, the protections have been waived or otherwise overborne by one or more of the following disclosures in combination with Federal Rule of Evidence 502(a):
   a. Disclosures to Deloitte;
   b. Disclosures to the Audit Committee Guests; and
   c. Disclosures to the Department of Labor.

4. Even if any work product protection is left after applying the principles set forth above, Zwick has established a substantial need for the documents within the meaning of Federal Rule of Civil Procedure 26(b)(3)(A)(ii).

5. DLA Attorney Eric Roberts is compelled to appear for his deposition at the offices of Plaintiff Zwick's counsel on a date to be agreed upon within 21 days of the Court's order.

6. Any other relief that the Court deems just and proper.


Dated:  February 21, 2015                          Respectfully submitted,

                                                   *David Zwick*
                                                   /s/ Stuart J. Chanen

Stuart J. Chanen
Nicole Nehama Auerbach
Margot Klein
VALOREM LAW GROUP
35 East Wacker Drive, Suite 3000
Chicago, IL  60601
(312) 676-5460
Stuart.Chanen@valoremlaw.com
Nicole.Auerbach@valoremlaw.com
Margot.Klein@valoremlaw.com

22

**<u>CERTIFICATE OF SERVICE</u>**

I certify that on Saturday, February 21, 2015, I caused a true and correct copy of the

foregoing document to be served on all counsel of record via the Court's ECF system.


<u>/s/ Stuart J. Chanen</u>