UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

DAVID ZWICK,

    Plaintiff,

    v.

INTELIQUENT, INC.; RICHARD MONTO;
JOHN HARRINGTON,

    Defendants.

No. 14 C 5044

Judge Thomas M. Durkin

**MEMORANDUM OPINION AND ORDER**

David Zwick alleges that his former employer, Inteliquent, fired him without cause in violation of his employment contract (Count III), the anti-retaliation provision of the Sarbanes-Oxley Act of 2002, 18 U.S.C. § 1514A(c)(2)(C) (Count VII), and anti-retaliation common law in Illinois (Count VIII). *See* R. 9. Zwick also alleges that because he was fired without cause Inteliquent owes him payments of stock and money pursuant to certain compensation contracts (Counts IV, V, and VI) and the Illinois Wage Payment and Collection Act ("IWPCA") (Count IX). *Id.* Zwick alleges that Inteliquent's in-house counsel, Richard Monto and John Harrington, are also liable for the alleged violation of the IWPCA (Count IX). *Id.* Separately, Zwick alleges that Inteliquent breached certain stock grant and stock options contracts when Inteliquent failed to pay him stock and allow him to exercise stock options in the wake of an alleged "Change of Control" of Inteliquent (Counts I and II). *Id.* Defendants have moved pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss Zwick's claims against Inteliquent for breach of contract (Counts I and II)

and violation of Illinois anti-retaliation common law (Count VIII), and Zwick's claims against Monto and Harrington for violation of the IWPCA (Count IX). R. 19. For the following reasons, Defendant's motion is granted as to Count VIII, and denied as to Counts I, II, and IX.

## Legal Standard

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). A complaint must provide "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), sufficient to provide defendant with "fair notice" of the claim and the basis for it. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). This standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While "detailed factual allegations" are not required, "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. The complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). "'A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Mann v. Vogel*, 707 F.3d 872, 877 (7th Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678). In applying this standard, the Court accepts all well-pleaded facts as true and draws all reasonable inferences in favor of the non-moving party. *Mann*, 707 F.3d at 877.

**Background**

**I. Events Precipitating the Termination of Zwick's Employment**

Zwick was Inteliquent's Chief Financial Officer and Executive Vice-President. R. 9 ¶ 9. On October 19, 2012, Zwick told Inteliquent's CEO that he had "concerns . . . about insider share sales at Inteliquent." *Id.* ¶ 69. Inteliquent's CEO urged Zwick to convey his concerns to Inteliquent's Audit Committee Chair. *Id.* ¶ 70. Zwick also expressed his concerns to Inteliquent's outside counsel. *Id.* ¶ 71.

Sometime during the second quarter of 2013, Inteliquent commenced an internal investigation regarding the company's financial forecasting practices, including "anonymous allegations of wrongdoing [against] Mr. Zwick." *Id.* ¶ 39c. Inteliquent retained the law firm DLA Piper to conduct the investigation. *Id.* ¶ 39a. DLA interviewed Zwick on July 16, 2013 and August 1, 2013, during which interviews Zwick expressed concerns about stock trades made by Rian Wren, who was an Inteliquent director and the company's former CEO. *Id.* ¶¶ 72-73. The investigation "concluded that anonymous allegations of wrongdoing [against] Mr. Zwick and others at the company were completely unfounded." *Id.* ¶ 39c.

Inteliquent terminated Zwick's employment on August 22, 2013. *Id.* ¶ 36. Zwick alleges that Inteliquent's stated reason for firing him (or asking him to resign) was that he spoke with another employee about the internal investigation and lied about this conversation to the investigators. *Id.* ¶ 37. Zwick alleges that this reason is pretextual, and that Inteliquent actually fired him in retaliation for expressing concerns about insider trading at Inteliquent. *Id.* ¶ 75.

At the time Zwick was fired, Richard Monto was Inteliquent's Senior Vice-President and General Counsel, and John Harrington was Inteliquent's Senior Vice-President for Litigation, Regulatory, and Human Resources. *Id.* ¶¶ 11-12. Zwick alleges that Monto and Harrington were "officers" of Inteliquent. *Id.* ¶ 85. In his proposed amended allegations (the force of which the Court will discuss below), Zwick alleges that Monto and Harrington both had "significant" or "central" roles in the decision to terminate Zwick's employment, R. 23-3 ¶¶ 85A, 85D, in that they advised Inteliquent's board of directors regarding Zwick's termination, *id.* ¶ 85G. Zwick also alleges that Monto and Harrington "knowingly participated in" and "handled the discussions with Mr. Zwick . . . regarding . . . the nominal severance that was offered to him," and regarding "Inteliquent not paying Mr. Zwick the 'final compensation' due and owing him," in violation of the IWPCA. *Id.* ¶¶ 85J, 85I.

## II. The Contractual Agreements Governing Zwick's Compensation

Zwick and Inteliquent entered into an employment agreement on October 1, 2012, which was amended on March 1, 2013 (the "Employment Agreement"). R. 9 ¶ 13; *see* R. 9-1. Zwick and Inteliquent also entered into "Stock Grant Agreements," which provided that 50% of Zwick's "then-unvested stock grants were to vest immediately upon a 'Change of Control,' as that term is defined in the Employment Agreement." R. 9 ¶ 21. Zwick and Inteliquent also entered into "Stock Option Agreements," which provided that 50% of Zwick's "unvested stock options vested immediately upon a Change of Control." *Id.* ¶ 22. The Employment Agreement defines a "Change of Control," in relevant part, as

4

> any transaction . . . in which any one person, or more than one person acting as a group . . . acquires . . . assets from [Inteliquent] that have a total gross fair market value equal to or more than forty (40) percent of the total gross fair market value of all of the assets of [Inteliquent] immediately before such acquisition . . . .

R. 9-1 at 5. The Employment Agreement also provides that this "definition is intended to comply with the definitions . . . set forth in the Treasury Regulations issued under section 409A(a)(2)(A)(v)." *Id.* The relevant Treasury Regulation provides that "gross fair market value means the value of the assets of the corporation, or the value of the assets being disposed of, determined without regard to any liabilities associated with such assets." 26 C.F.R. § 1.409A-3(i)(5)(vii).

On April 30, 2013, Inteliquent sold certain assets to another company for "approximately $54.5 million." R. 9 ¶ 19. Zwick alleges that "[o]n April 30, 2013, the 'fair market value' of Inteliquent, as that term was used in the Employment Agreement, was approximately $96 million." *Id.* ¶ 18. Zwick alleges that this asset sale constituted a change of control because $54.5 million is 57% of $96 million. *Id.* ¶ 20.

Inteliquent attaches its SEC 10-Q filing for the first quarter of 2013 to its motion. *See* R. 20-1 at 2-34.[1] In that filing, Inteliquent included a balance sheet

---

[1] The Court takes judicial notice of the information in Inteliquent's SEC filings. *See Ennenga v. Starns*, 677 F.3d 766, 773 (7th Cir. 2012) ("Taking judicial notice of matters of public record need not convert a motion to dismiss into a motion for summary judgment."); *In re Abbott Depakote Shareholder Derivative Litig.*, 2013 WL 2451152, at *3 n.3 (N.D. Ill. June 5, 2013) ("the Court may take judicial notice of [a] fact" disclosed in Form 10-K); *Patten v. N. Trust Co.*, 703 F. Supp. 2d 799, 803 n.2 (N.D. Ill. 2010) ("The court takes judicial notice of matters of public record, such as stock prices and SEC filings.").

5

stating that the total value of its assets as of March 31, 2013 was $150.627 million, and that the assets it sold on April 30, 2013 were worth $50.7 million. *Id.* at 3. That balance sheet also stated that Inteliquent had liabilities in the amount of $43.567 million, and shareholder equity in the amount of $107.060 million. *Id.*

## Analysis

**Counts I and II: Change of Control**

Zwick claims that Inteliquent owes him payments of stock and money pursuant to the Stock Grant and Stock Option Agreements, which provide for accelerated payment to him in case of a "change of control," including the event of Inteliquent selling more than 40% of its assets. Zwick argues that Inteliquent sold about 56% of its assets on April 30, 2013, when it sold some of its assets for "approximately $54.5 million," and Inteliquent's "fair market value" at the time of the sale was "approximately $96 million."

Inteliquent argues that its SEC filings demonstrate that Zwick's allegations of the fair market value of the assets in question are inaccurate. Inteliquent cites its SEC filing for the first quarter of 2013 (filed on May 8, 2013), which shows that the value of Inteliquent's assets as of March 31, 2013 was $150.627 million. That filing also reports that as of March 31 the value of the assets Inteliquent sold on April 30 was $50.7 million. On the basis of these asset values, Inteliquent argues that the April 30 asset sale did not constitute a "change of control" because Inteliquent only sold approximately 33% of its assets. *See* R. 20 at 11.

6

Zwick argues that the asset values in Inteliquent's SEC filings do not undermine the plausibility of his allegations of asset value. *See* R. 23 at 3-4. On their face, however, the values from Inteliquent's SEC filings do exactly that. Zwick does not dispute the accuracy of the data in Inteliquent's 10-Q SEC filing of May 8; nor could he since as CFO he signed and certified the May 8 filing. R. 20-1 at 19. Yet, Zwick stands by his allegation that the total value of Inteliquent's assets on April 30 was "approximately $96 million," not the $150.627 million as of March 31 as stated in the SEC filing. But if the asset values in the balance sheet are the asset values contemplated by the operative "change of control" definition, the March 31 valuations make it implausible that the value of Inteliquent's assets fell to $96 million 30 days later—absent an alleged explanation for such a precipitous decrease, which has not been forthcoming from Zwick.

The problem with Inteliquent's argument is that it asks the Court to assume that the asset values in the balance sheet Inteliquent filed with the SEC are the "total gross fair market value" of the assets, as is relevant to the operative definition of "change of control." This is by no means certain, since as Zwick points out, "economists . . . disagree about the manner in which a specific value at a specific time may be calculated." R. 23 at 5. This disagreement has been reflected in litigation before the Seventh Circuit. For instance, in a case that turned on the statutory interpretation of the term "net worth," the Seventh Circuit noted that there is a difference between "balance sheet net worth" and "fair market net worth," and in that case "the different interpretations [would] result in substantially

7

different recoveries." *Sanders v. Jackson*, 209 F.3d 998, 1000 (7th Cir. 2000); *see also Cole v. C.I.R.*, 871 F.2d 64, 66 (7th Cir. 1989) ("The balance sheets reflect the value of [the] assets as cost of the assets less depreciation; there is no indication of fair market value in the record."); *Fishman v. Estate of Wirtz*, 807 F.2d 520, 554 (7th Cir. 1986) ("The district court was not valuing the teams according to how they appear on a balance sheet; rather, it was assessing how the market valued the teams' 'assets,' in the layman's sense of that term."). Since the particular relevance of the asset values in Inteliquent's balance sheet is in question, those asset values are an insufficient basis for the Court to find that Zwick's allegations are not well-pleaded.

Inteliquent, however, contends that there is no question that the balance sheet values are "fair market values," because Inteliquent's SEC filings also state that it "considered fair market value comparisons to determine the value of those assets" listed in its balance sheet. R. 25 at 3. Inteliquent's statements in its SEC filings, however, are not as unambiguous as Inteliquent implies, and so they do not serve to remove the question of the relevance of the balance sheet asset values. Although Inteliquent states that it "considered market value comparisons to determine fair value," R. 25-1 at 53, it also states that it only undertakes this valuation process "whenever events or changes in circumstances indicate" that it is appropriate to do so. *See id.* at 54, 72. This statement implies that not all the asset values in the balance sheet are "fair market values." Moreover, Inteliquent does not simply say its balance sheet reflects "fair market value." Instead, Inteliquent's SEC

8

filings described a sophisticated valuation process. *See* R. 25-1. Inteliquent has not cited any authority indicating that Inteliquent's valuation process comports with the "total gross fair market value" contemplated by the operative definition of "change of control." Absent such authority or evidence, the Court cannot find that the asset values in Inteliquent's balance sheet undermine Zwick's allegations. Accordingly, Inteliquent's motion to dismiss Counts I and II is denied.

**Count VIII: Retaliatory Discharge under Illinois Common Law**

Zwick claims that Inteliquent impermissibly discharged him in retaliation for raising "concerns . . . about insider share sales at Inteliquent." R. 9 ¶ 69. Zwick claims that this conduct violated both the Sarbanes-Oxley Act, 18 U.S.C. § 1514A(c)(2)(C), and Illinois common law. Both Sarbanes-Oxley and Illinois common law prohibit employers from firing employees for engaging in conduct that is "protected" under the respective statutes. Inteliquent does not dispute that Zwick's conduct was statutorily "protected."

Instead, Inteliquent argues that Illinois courts do not permit common law actions for retaliatory discharge "where statutory remedies already serve as adequate deterrents to the alleged misconduct." R. 20 at 3 (citing *United States ex rel. Schultz v. Cancer Treatment Ctrs. of Am.*, 2002 WL 31497338, at *3 (N.D. Ill. Nov. 4, 2002)). A number of courts in this District have dismissed retaliatory discharge claims when the plaintiff also claimed that the retaliation violated a federal or state statute. *See McCormack v. Medcor, Inc.*, 2014 WL 5622172, at *6 (N.D. Ill. Nov. 4, 2014); *O'Connell v. Continental Elec. Constr. Co.*, 2011 WL

9

4916464, at *10-11 (N.D. Ill. Oct. 17, 2011); *Jarmoc v. Consolidated Elec. Distribs.*, 1992 WL 211511, at *3 (N.D. Ill. Aug. 26, 1992).

Despite this authority, Zwick argues that his retaliatory discharge claims should proceed under both federal and state law because Illinois common law provides for punitive damages and Sarbanes-Oxley does not, and so the claims are not identical. *See* R. 23 at 1-2. However, Illinois courts do not require the statutory remedy to be *identical* to the common law remedy in order for the common law remedy to be prohibited, but merely that a statute provides an *alternative* remedy. *See Stebbings v. Univ. of Chicago.*, 726 N.E.2d 1136, 1141 (Ill. App. Ct. 1st Dist. 2000). Illinois courts are concerned that some remedy be available to deter conduct that is contrary to public policy, but find common law remedies superfluous if a statutory remedy is already available. *Id.; Leweling v. Schnadig Corp.*, 657 N.E.2d 1107, 1112 (Ill. App. Ct. 1st Dist. 1995). The penalties provided by Sarbanes-Oxley (including reinstatement, back pay with interest, and compensatory damages, such as litigation costs, reasonable attorney fees and expert witness fees) are a sufficient deterrent under the circumstances. Since Zwick has an adequate remedy for his alleged retaliatory discharge under the Sarbanes-Oxley Act, his Illinois common law claim for retaliatory discharge is dismissed.[2]

---

[2] Zwick also argues that he should be permitted to proceed with both his federal and state retaliation claims because Sarbanes-Oxley expressly provides that it does not preempt state law. R. 23 at 1-2. The relevant question, however, is not whether federal law preempts state law, but whether Illinois law limits the availability of a remedy under its common law due to the existence of a statutory remedy (regardless of whether the statute is federal or state law). This is a question of Illinois law, to which Congressional intent to preempt state law is irrelevant.

10

**Count IX: IWPCA Claim Against Monto and Harrington**

Zwick concedes that his allegations against Monto and Harrington in the First Amended Complaint (R. 9) are insufficient to state an IWPCA claim. R. 23 at 9. Rather than attempt to defend his current allegations, Zwick seeks leave to amend his complaint with respect to the allegations supporting this claim, and he has attached proposed allegations to his brief. *See* R. 23-3. Monto and Harrington ask the Court to deny Zwick leave to amend, arguing that Zwick's proposed amended allegations do not cure the deficiencies of his current complaint. R. 25 at 7. Since the Court must "freely give leave to amend when justice so requires," Fed. R. Civ. P. 15(a)(2), the Court grants Zwick leave to amend and considers Zwick's proposed amended allegations on their merits.

Monto and Harrington argue that Zwick's amended allegations do not address the deficiencies in Zwick's original allegations because the Illinois Supreme Court has held that "personal [IWPCA] liability [is reserved] for those individual *decision makers* who knowingly permitted the Wage Act violations." *Andrews v. Kowa Printing Corp.*, 838 N.E.2d 894, 899-900 (Ill. 2005) (emphasis added). Monto and Harrington argue that Zwick's allegations demonstrate that they were not "decision makers," because Zwick alleges that they merely "participated in" and "executed" a decision that was actually made by Inteliquent, and they did not have the power "to cause Inteliquent to pay or not pay the wages at issue." R. 25 at 6-8.

Monto and Harrington's argument reads both Zwick's amended allegations and the Illinois Supreme Court's interpretation of the IWPCA too narrowly. With

respect to the sufficiency of Zwick's allegations, the fact that Zwick alleges that *Inteliquent* made the decision not to pay him in accordance with the IWPCA does not eliminate the possibility that *individual* officers or decision makers at Inteliquent may also be liable. In *Andrews*, the court specifically held that "[l]iability under the [IWPCA] can be imposed upon employers, as that term is traditionally understood, *and* upon any officers of a corporation or agents of an employer who knowingly permit the [IWPCA] violation." 838 N.E.2d at 901 (emphasis added). There is no dispute that Inteliquent was Zwick's employer, so any "decision" with respect to Zwick's employment status or compensation is certainly attributable to Inteliquent. But Zwick's allegation to this effect does not mean that individual decision makers like Monto and Harrington cannot also be liable.

Furthermore, Monto and Harrington's argument that Zwick "merely" alleges that they "participated in" and "executed" the decision ignores a number of allegations in Zwick's amendments that identify Monto and Harrington as "decision makers" with respect to Zwick's severance compensation. Zwick alleges that Monto and Harrington were both officers of Inteliquent. *See* R. 23-3 ¶ 85D; R. 9 ¶ 38e. Zwick also alleges that Monto and Harrington had a "significant" and "central role in the *decision* to terminate Mr. Zwick." R. 23-3 at ¶¶ 85A, 85D (emphasis added). In addition to their role in the termination decision, Zwick specifically alleges that Monto and Harrington made the decision to not pay Zwick in accordance with the IWPCA, when he alleges that Monto and Harrington "handled the discussions with

Mr. Zwick . . . regarding . . . the nominal severance that was offered to him," and regarding "Inteliquent not paying Mr. Zwick the 'final compensation' due and owing him." *Id.* ¶ 85I. These allegations are entirely plausible in light of (1) Zwick's additional allegation that Harrington "had direct responsibility for human resources functions, including but not limited to the final pay of departing executives such as Mr. Zwick," *id.* ¶ 85A; and (2) Monto's position as general counsel, *id.* ¶ 85D. These allegations are sufficient to state a claim that Monto and Harrington were "decision makers" regarding how much to pay Zwick upon his termination.

Monto and Harrington also read the term "decision maker" too narrowly when they argue that only Inteliquent and its Board members can be liable for any violation of the IWPCA because "neither Monto nor Harrington had the authority to direct the Board on how to handle the situation." R. 25 at 8. Monto and Harrington's argument is based on a strict application of the Illinois Supreme Court's view that IWPCA § 13 "reserves personal [IWPCA] liability for those individual decision makers who knowingly permit[] the [IWPCA] violation." *Andrews*, 838 N.E.2d at 899-900. This statement from the court, however, came in the context of distinguishing § 13 from the much broader § 2, which provides that "any person . . . acting directly or indirectly in the interest of an employer in relation to an employee," can be held liable for an IWPCA violation. 820 ILCS 115/2. The court rejected the idea that § 2 defined the scope of individual liability under the IWPCA, and held rather that it defined "who may inculpate the employer." *Andrews*, 838

13

N.E.2d at 899. The court emphasized that § 13 "defines who, other than the employer itself, may be treated as an 'employer' for purposes of the [IWPCA]," and noted that what distinguished the "officers of a corporation or agents of an employer" included in § 13 from the broad list of individuals in § 2 was that they could "knowingly permit" IWPCA violations, and thus were "decision makers" with respect to the IWPCA. *Andrews*, 838 N.E.2d at 899. Since the statutory language itself does not include the term "decision maker," there is no reason to think that the court's intention was to take the drastic step of adding an element to the statute in order to limit potential individual liability to "decision makers." Rather, the context of the court's analysis indicates that the court intended to explain that "officers of a corporation or agents of an employer who knowingly permit" an IWPCA violation are "decision makers," and thus they can be personally liable, whereas other individuals who fall within the broad scope of § 2 who do not have the authority to "knowingly permit" IWPCA violations are not "decision makers."

There is not a wealth of case law applying this particular IWPCA provision, but two cases from this District indicate that Monto and Harrington's argument that only Inteliquent's board members can be liable under these circumstances is too narrow. In *Ziccarelli v. Phillips*, the plaintiff alleged that he was fired by his immediate supervisor, but that the company president was also liable because any action by the plaintiff's immediate supervisor "require[d] [the company president's] advice or consent and thus he was acting directly or indirectly in the interest of [the company] in relation to [the plaintiff]." 2013 WL 5387864, at *12 (N.D. Ill. Sept. 25,

14

2013). The court held that these allegations "suggest that [the president] knowingly permitted the alleged IWPCA violations to occur." *Id.* Even though the company president may have merely "advis[ed]" or "consent[ed]" to a decision that was made by another "officer or agent" of the company, the company president "knowingly permitted" that decision to be made, and thus he was potentially personally liable for any IWPCA violation.

The court in *Corso v. Suburban Bank & Trust Co.*, 2006 WL 418655 (N.D. Ill. Feb. 16, 2006), applied a similar analysis. In *Corso* the defendant bank's compensation committee denied a bonus payment to the plaintiff. *Id.* at *3. The plaintiff claimed that two individual directors (the wife and son of the bank's former chairman, president, and CEO) were personally liable for the bonus payment. *Id.* at *2, 7. The court granted summary judgment to the individual directors because it was undisputed that the bank's compensation committee had sole authority to determine bonuses, and that the individual directors were not members of the compensation committee. *Id.* at *8. The court's analysis, however, did not end with the fact that the individual directors were not members of the committee directly responsible for the relevant decision. Instead, the court noted that the individual directors "did not communicate with the Committee members and were not present during the Committee meetings." *Id.* The court concluded, "Given that [the individual directors] were not in a position to *affect* the Committee's decision to withhold bonuses, and did not *consult* with the Committtee about [the plaintiff's]

bonus, [the plaintiff] has not established a basis for individual liability under the IWPCA." *Id.* (emphasis added).

The analyses of the courts in *Ziccarelli* and *Corso* comport with the Court's interpretation of the Illinois Supreme Court's decision in *Andrews*. The IWPCA does not require an individual defendant to have directly made the decision alleged to have violated the IWPCA. Rather, an individual defendant is a "decision maker" for the purposes of the statute, if the individual was in a position to "knowingly permit" the employer to violate the statute. Courts in this District have interpreted "knowingly permit" broadly to mean "advise" or "consent" as in *Corso*, or "affect" or "consult" as in *Ziccarelli*. Zwick has at least alleged that Monto and Harrington were officers of Inteliquent, and that they "advised" and "affected" the Board's decision to fire Zwick, and has specifically alleged that Monto and Harrington had direct responsibility for the decision regarding Zwick's severance payments. Thus, Zwick has stated a claim for violation of the IWPCA against Monto and Harrington.

## Conclusion

For the foregoing reasons, the Defendants' motion to dismiss, R. 19, is granted in part and denied in part. The motion is granted in that Count VIII is dismissed with prejudice. The motion is denied with respect to Counts I & II. The motion is granted without prejudice with respect to Count IX as originally pled, and denied with respect to Count IX as amended. Zwick is ordered to file a second amended complaint that includes the allegations in document R. 23-3.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: March 18, 2015